

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN WHITE,<br><br>*Defendant.* | Case No. 3:25-cr-105<br><br>Health Care Fraud<br>18 U.S.C. § 1347<br>(Count One)<br><br>Forfeiture Allegation |



## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### INTRODUCTORY ALLEGATIONS

At all times material to the Criminal Information, unless otherwise stated:

<u>Virginia Medicaid Programs</u>

1. The Medicaid program was established by Title 19, Social Security Act of 1965, to provide medical assistance to indigent persons. The United States Department of Health and Human Services and the Commonwealth of Virginia, Department of Medical Assistance Services (DMAS), administer and supervise the administration of the Medicaid program in Virginia, which is called the Virginia Medical Assistance Program (Medicaid). Federal and state governments jointly provide funding for Medicaid.

2. Medicaid is a "health care benefit program" as defined in 18 U.S.C. § 24(b).

3. One of the services Medicaid covers is group home residential care or services. Group home residential services consist of skill-building and supporting the development of routine, general, and safety practices to enable an individual to acquire, retain, or improve skills necessary to successfully live in the community. For example, a Medicaid recipient diagnosed with

autism or Down syndrome may require group home residential services because they require support to live as independently as possible.

4. Group home residential services are only available to those individuals on the Community Living waiver, which is a Virginia Medicaid program designed to support qualified individuals who require some form of residential services by paid staff 24 hours per day, seven days per week. This service may be provided to individuals who are living in (i) a group home or (ii) the home of an adult foster care provider, and may be provided either individually or simultaneously to more than one individual living in that home, depending on the required support.

5. Group home residential services will be authorized for Medicaid reimbursement only when the individual requires these services, and those services are set out in the individual's list of documented needs. Allowable services may include:

   a. Skill-building and providing routine supports related to activities of daily living—such as toileting, eating, or dressing—and more advanced skills called instrumental activities of daily living—such as preparing food, hygiene supports, and managing medication;

   b. Skill-building and providing routine and safety supports related to the use of community resources, such as transportation, shopping, restaurant dining, participating in social and recreational activities, and safety supports to ensure the individual's health and safety; and

   c. Supporting the individual in replacing challenging behaviors with positive, accepted behaviors for home and community environments.

6. Reimbursable group home residential services may not duplicate those that are funded or provided by another source. Medicaid will not reimburse group home residential

providers for individuals who reside in or make long-term visits to nursing facilities, intermediate care facilities for individuals with intellectual disabilities, hospitals, prisons/jails, assisted living facilities, or family members' homes (i.e., if a Medicaid recipient leaves the group home that provides their full-time care to spend holidays with their family).

7. Medicaid will only reimburse providers for the level of care to which the individual has been assigned based on the individual's assessed needs and according to the number of beds in the home. The approved level of care is determined by a qualified health care professional and depends on the particular needs and independence of the Medicaid recipient. Reimbursement varies according to the approved level of care: services for recipients assessed to need higher levels of care correspond to higher reimbursement amounts from Medicaid than services provided to recipients assessed to need a lower level of care.

8. The Medicaid billing unit of service for group home residential services is one day. Providers may bill Medicaid if any qualified service for the recipient is provided during that day.

## The Defendant and Ithiel Group

9. The defendant, KEVIN WHITE, has solely owned and operated Ithiel Group since at least 2010. Ithiel Group is a developmental disability group home provider with multiple locations in the metropolitan Richmond area, which is within the Eastern District of Virginia.

10. From at least in or about February 2012, through at least in or about January 2025, Ithiel Group offered group home residential services for which it received Medicaid reimbursement, which Medicaid paid into bank accounts controlled by WHITE.

## THE SCHEME AND ARTIFICE TO DEFRAUD

11. Beginning in at least October 2016 and continuing through at least February 2023, the defendant, KEVIN WHITE, knowingly devised a scheme or artifice to defraud a health care

benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, a health care benefit program as defined by Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

12. The primary purpose of the scheme and artifice was for WHITE to unlawfully enrich himself by submitting to Medicaid claims for reimbursement for group home residential services that had not actually been provided.

13. To accomplish this, it was part of the scheme and artifice that WHITE submitted billing to Medicaid that falsely reflected recipients' attendance and receipt of services at Ithiel Group's facilities on dates that those recipients were not, in fact, present. In this way, WHITE submitted false claims for Medicaid reimbursement of group home residential services that WHITE knew had not actually been provided.

14. It was further part of the scheme and artifice that, through this conduct, the defendant caused monetary losses to Medicaid in the amount of at least $461,704.23.

<u>Manner and Means of the Scheme and Artifice to Defraud</u>

The manner and means of the scheme and artifice to defraud included, but were not limited to, the following:

15. As owner of Ithiel Group, WHITE was responsible for ensuring that Ithiel Group's services were provided and billed in accordance with Medicaid's rules and regulations.

16. Despite this obligation, WHITE billed Medicaid for the purported care of recipients who resided in Ithiel Group's homes despite knowing that these recipients were often hospitalized, incarcerated, at another facility, or on a home visit. Often, Ithiel Group's own medical records

stated that the resident was absent from Ithiel Group.

17. In total, WHITE submitted false claims for services not rendered for 19 recipients.

18. It was often the case that WHITE or WHITE's managers sent employees home because there were no recipients present in the Ithiel Group homes to receive residential support services. WHITE did not pay his own employees if they were sent home early, yet WHITE often billed Medicaid as if the Medicaid recipients had been present (when in fact they had not).

### A. WHITE Double Billed Two State Agencies for Mutually Exclusive Programs

19. WHITE also billed two different state agencies in mutually exclusive ways: he charged Medicaid for *providing* group home residential services that he knew had not been provided to the Medicaid recipients; and WHITE submitted claims to another state agency because he *could not provide* group home residential services for those same dates for which he was simultaneously billing Medicaid for precisely such services. WHITE even received payment from both agencies for three patients for the same periods of time.

20. The Virginia Department of Behavioral Health and Developmental Services (DBHDS) has a small pool of funding set aside to provide contingency funding for crises experienced by group home and other providers. Examples of applicable crises would include modifying facilities to meet complex resident needs, providing unexpectedly high levels of support needed for a resident until those levels could be readjusted, or—in rare cases—to hold bed space for an unexpected absence by a resident because the resident has been hospitalized or incarcerated.

21. From in or around August 2018 to in or around June 2024, WHITE submitted 31 requests for crisis funding from DBHDS. DBHDS approved 27 of these requests, and four were denied by DBHDS or retracted by WHITE. WHITE requested over $1,000,000 in crisis funding

(in the aggregate) for these requests, and DBHDS paid WHITE through Ithiel Group $463,000 for the 27 approved requests.

22. In 2018, DBHDS reimbursed WHITE for holding a group home bed for an absent resident due to extenuating circumstances, but DBHDS notified WHITE (through its contractor) that the payment was a one-time occurrence. WHITE did not submit any further requests to hold beds after this request.

23. The presence of this funding and WHITE's pursuit of it, and DBHDS's approval of the one-time claim but its accompanying statement that further requests for funds to hold bed space would not be approved, demonstrates that WHITE knew he could not bill Medicaid to hold bed space for absent recipients. If WHITE could bill Medicaid to hold beds for absent recipients, there would be no need to apply for special funding from DBHDS to hold beds for absent recipients. Further, WHITE understood that it was easier to simply and falsely bill DMAS because WHITE would not have to submit a special request to DMAS to bill for absent recipients, as DBHDS required.

24. For three recipients, WHITE submitted claims to both DBHDS and to Medicaid for group home care for the same periods, receiving $61,621 from DBHDS because Ithiel Group purportedly could not provide care for these three absent recipients, and $107,644.88 from Medicaid because Ithiel Group purportedly provided care for these same three recipients. These two programs are, by their terms, mutually exclusive, and WHITE knew and understood, by virtue of his billings to DBHDS, that he was not entitled to bill Medicaid for absent recipients.

**B. *Representative Examples of Fraud***

25. One representative example of WHITE's scheme and artifice to defraud involved Resident 1, for whom WHITE billed Medicaid for residential group home services purportedly

provided at an Ithiel Group home. Resident 1 was hospitalized from August 21, 2019, through December 4, 2019. Despite Resident 1 receiving full-time care from the hospital in which she was hospitalized, WHITE billed Medicaid as if Ithiel Group had provided Resident 1 with group home residential services from August 21, 2019, through December 4, 2019. Resident 1 had a documented history of tampering with wounds and surgical dressings, and often had to be restrained while hospitalized to prevent her from interfering with her surgical dressings. She also suffered from suicidal ideations, and was a vulnerable recipient who required high levels of care.

26. Another representative example of WHITE's scheme and artifice to defraud involved Resident 2, for whom WHITE billed Medicaid for group home residential services purportedly provided at an Ithiel Group home. Resident 2 was hospitalized from November 28, 2019, through January 21, 2020. Despite Resident 2 receiving full-time care from the hospital in which he was hospitalized, WHITE billed Medicaid as if Ithiel Group had provided group home care to Resident 2 from November 28, 2019, through January 21, 2020.

27. Another representative example of WHITE's scheme and artifice to defraud involved Resident 3, for whom WHITE billed Medicaid for residential group home services purportedly provided at an Ithiel Group home. Resident 3 departed an Ithiel Group home to reside at Resident 3's family home for a visit over the Thanksgiving holiday, from November 25, 2019, through November 30, 2019. Despite Resident 3 receiving full-time care from his family while on his home visit, WHITE billed Medicaid as if Ithiel Group had provided group home care to Resident 3 from November 25, 2019, through November 30, 2019.

28. Resident 3 also departed an Ithiel Group home for a visit to his family home from December 10, 2019, through December 12, 2019. Despite Resident 3 receiving full-time care from

his family while on his home visit, WHITE billed Medicaid as if Ithiel Group had provided group home care to Resident 3 from December 10, 2019, through December 12, 2019.

29. Resident 3 also returned to his family's home for a visit over the Christmas holiday, from December 23, 2019, through December 28, 2019. Despite Resident 3 receiving full-time care from his family while on his home visit, WHITE billed Medicaid as if Ithiel Group had provided group home care to Resident 3 from December 23, 2019, through December 28, 2019.

30. Another representative example of WHITE's scheme and artifice to defraud involved Resident 4, for whom WHITE billed Medicaid for group home residential services purportedly provided at an Ithiel Group home. Resident 4 was hospitalized from August 5, 2020, through August 14, 2020. Despite Resident 4 receiving full-time care from the hospital in which he was hospitalized, WHITE billed Medicaid as if Ithiel Group had provided group home care to Resident 4 from August 5, 2020, through August 14, 2020.

31. Another representative example of WHITE's scheme and artifice to defraud involved Resident 5, for whom WHITE billed Medicaid for residential group home services purportedly provided at an Ithiel Group home. Resident 5 was incarcerated from January 21, 2019, through March 12, 2019. Despite Resident 5 being in the physical custody of the Virginia Department of Corrections, WHITE billed Medicaid as if Ithiel Group had provided group home care to Resident 5 from January 21, 2019, through March 12, 2019. Resident 5 was one of the three recipients for whom Ithiel Group received funds from both Medicaid and DBHDS during this period. Resident 5 had a documented history of violent behavior and outbursts towards group home and other staff, and her incarceration was related to her assaulting group home staff.

32. WHITE was responsible for and in fact submitted billing to Medicaid and DBHDS on behalf of Ithiel Group, and personally submitted fraudulent claims for services not rendered.

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) Fed. R. Crim. P., defendant, KEVIN WHITE, is hereby notified that upon conviction of the offense alleged in Count One of this Criminal Information, he shall forfeit to the United States any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

The property subject to forfeiture includes, but is not limited to the following:

A sum of money of at least $461,704.23, which represents the proceeds of the offenses charged and which shall be reduced to a money judgment against the defendant in favor of the United States.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets, pursuant to 21 U.S.C § 853(p).

(All in accordance with Title 18, United States Code, Section 982(a)(7) and Title 21, United States Code, Section 853(p)).

Respectfully submitted,

Erik S. Siebert
United States Attorney

Date:  June 25, 2025          By:  _/s/_

Shea Matthew Gibbons
Assistant United States Attorney